# In the United States District Court for the Southern District of Georgia Savannah Division

AMANDA BETH RIVERA-LOPEZ,
Individually and as Executrix
of the Estate of Emil Rivera-
Lopez, deceased; J.N.; J.J.;
W.W.; M.P.; C.H.; and Their
Spouses,

    Plaintiffs,

    v.

GENERAL ELECTRIC COMPANY,

    Defendant.

4:19-CV-211

## ORDER

Before the Court is Defendant General Electric Company's (hereinafter "GE") motion to dismiss Plaintiffs' second amended complaint. Dkt. No. 95. The motion has been fully briefed, and the parties have appeared before the Court for oral argument. See Dkt. Nos. 100, 106, 124. For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises from a helicopter crash that occurred during a military training exercise which took place off the coast of Yemen on August 25, 2017 (hereinafter "the Crash"). Dkt. No. 94 ¶ 1. At the time of the Crash, Emil Rivera-Lopez and Plaintiffs

J.N., J.J., W.W., M.P., and C.H. (collectively the "Flight Crew") were all members of the United States Military 160th Special Operations Air Regiment ("SOAR").[1] Id. ¶¶ 4–8. SOAR "specializes in flying difficult nighttime missions and often ferries ground special operator troops into battle." Id. ¶ 1. SOAR is based at Hunter Army Airfield in Savannah, Georgia, but at the time of the Crash, the unit "was deployed in the war on terrorism in Operation Inherent Resolve." Id. ¶¶ 1, 6.

## I.   Factual Background

On August 25, 2017, the Flight Crew was conducting "day into night hoist training" aboard their UH-60M Helicopter (hereinafter "the Helicopter"). Id. ¶ 21. As part of this training, the Flight Crew maintained the Helicopter at "training hoist profile which is minimal feet above the water level (AWL) and very slow knots indicated airspeed (KIAS)." Id. ¶ 22. During one of the Flight Crew's approaches for a training hoist, while maintaining their training hoist profile, the Helicopter "experienced a #2 engine failure which caused the aircraft to crash into the ocean." Id. ¶ 23. Emil Rivera-Lopez did not resurface after the crash, his body was never recovered, and the Army declared him dead on August 31, 2017. Id. ¶ 24. Other members of the Flight Crew, Plaintiffs

---

[1] Plaintiffs interchangeably refer to SOAR as the "Night Stalkers." See, e.g., Dkt. No. 94 ¶ 1.

J.N., JJ., W.W., M.P., and C.H., were all injured in the Crash.
Id.

According to Plaintiffs, the Helicopter was equipped with two
GE engines, and the engine that ultimately failed (hereinafter
"the Engine") "was overhauled at the GE Winfield plant in August
2016." Id. ¶ 25. Following the overhaul, GE "annotated the [E]ngine
as fully serviceable and [in compliance] with all manufacturers,
safety, and military contract standards," and the Engine was
installed on the Helicopter in March 2017. Id. ¶¶ 26-27. After the
Crash, an Army inspection revealed that "the [E]ngine's fuel
manifold No. 7 B-nut and injector were incorrectly installed by
Defendant." Id. ¶ 29. Because of the improper installation, "the
O-ring [became] displaced or lacerated by the present fuel
pressure," ultimately resulting "in a fuel leak during engine
operation." Id. "The fuel leak resulted in the [E]ngine [failing]
which caused the [H]elicopter to lose lift and crash." Id. ¶ 30.

## II. Procedural History

Plaintiffs initially filed suit against eight different
defendants for their actions in manufacturing the Helicopter. See
generally Dkt. No. 1. At the time, Plaintiffs did not have access
to the Army's report which summarized findings from the Crash
investigation (hereinafter "the Investigative Report").[2] See Dkt.

---

[2] The Investigative Report is an unclassified document prepared by
an Army investigating officer ("IO") for SOAR's Commanding

No. 100 at 5 ("The initial complaint in this matter was filed before any of the parties had any information from the Army investigation of this crash."). Upon the eight defendants' motion, dkt. no. 33, the Court dismissed the suit without prejudice on shotgun pleading grounds and provided Plaintiffs with leave to amend. Dkt. No. 93.

But following the initial dismissal, Plaintiffs received and analyzed the Investigative Report. See Dkt. No. 100 at 5 ("Since the filing of the initial complaints, the Army has produced [the Investigative Report]."). Relying on the Investigative Report's findings, Plaintiffs then filed a second amended complaint against only one defendant, GE.[3] Dkt. No. 94.  Therein, Plaintiffs bring claims of negligence (Count I), wrongful death and survival (Count II), strict liability (Count III), strict product liability (Count IV), and breach of warranties (Count V). Id.  They seek

_____

General. Dkt. No. 106-4 at 2. The IO prepared the Investigative Report, which includes findings and recommendations, after investigating the circumstances surrounding the Crash. Id. GE attached the Investigative Report as an exhibit to its reply brief in support of its motion to dismiss.

[3] At the hearing on this motion, Plaintiffs' counsel reiterated that, before having access to the Investigative Report, they had no way of knowing what caused the Crash. But the Investigative Report states that GE was at fault for the Engine's failure, and Plaintiffs' allegations in their second amended complaint track those findings. See Dkt. No. 106-4 at 2 (The engine failure was "caused by a fuel leak that resulted from the incorrect installation of the fuel manifold's 7 o'clock (No. 7) B-nut and injector by GE Aviation Winfield plant personnel during an engine overhaul in August 2016.").

compensatory damages, general damages, special damages, and punitive damages, as well as attorney fees and costs. Id. at 16-17.

GE now moves to dismiss the second amended complaint. Dkt. No. 95. GE's main contention is that Plaintiffs' entire lawsuit should be dismissed based on the political question doctrine. Id. at 3. GE also argues certain claims should be dismissed on shotgun pleading grounds, failure to plead with specificity, failure to meet the plausibility standard, etc. Id. at 2-3. Because the political question doctrine's application is a threshold matter that could bar Plaintiffs' case entirely, the Court begins there.

## I.   Political Question Doctrine

GE argues that this case is non-justiciable under the political question doctrine because adjudicating Plaintiffs' claims and GE's potential defenses will require the Court to question "core military decision-making." Dkt. No. 95.

### a. Legal Standard

The Court must first determine whether this case is nonjusticiable based on the political question doctrine. "The justiciability of a controversy depends not upon the existence of a federal statute, but upon whether judicial resolution of that controversy would be consonant with the separation of powers principles embodied in the Constitution." Aktepe v. United States, 105 F.3d 1400, 1402 (11th Cir. 1997) (citations omitted).

5

"Restrictions derived from the separation of powers doctrine prevent the judicial branch from deciding 'political questions,' controversies that revolve around policy choices and value determinations constitutionally committed for resolution to the legislative or executive branches." Id. (citations omitted). Analysis for the presence of a political question is a case-specific, fact-intensive inquiry, requiring a "discriminating inquiry into the precise facts and posture of the particular case." Baker v. Carr, 369 U.S. 186, 217 (1962). Because the political question doctrine is a constitutional limitation not imposed by the judiciary itself, the Court is "free to weigh the facts" and "not constrained to view them in the light most favorable to [the plaintiff]." Carmichael v. Kellogg, Brown & Root Servs., 572 F.3d 1271, 1279 (11th Cir. 2009).

**b. Doctrine Overview**

Before considering the intricacies of how the political question doctrine applies to this case and GE's arguments, a brief overview of the doctrine is in order.

At its core, the political question doctrine exists to bar courts from adjudicating disputes that would require the Court to evaluate questions exclusively committed to another branch of government. See Marbury v. Madison, 5 U.S. 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be

6

made in this court."); <u>Baker</u>, 369 U.S. at 210 ("The nonjusticiability of a political question is primarily a function of the separation of powers."); <u>Made in the USA Found. v. United States</u>, 242 F.3d 1300, 1312 (11th Cir. 2001) ("The political question doctrine emerges out of Article III's case or controversy requirement and has its roots in separation of powers concerns." (citing <u>Baker</u>, 369 U.S. at 210)). Put another way, "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." <u>Japan Whaling Ass'n v. Am. Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986). Courts must evaluate application of the political question doctrine on a case-by-case basis, ensuring a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and the possible consequences of judicial action." <u>Baker</u>, 369 U.S. at 211. In conducting this discriminating analysis, "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." <u>Coleman v. Miller</u>, 307 U.S. 433, 454-55 (1939); <u>see also</u> <u>Japan Whaling Ass'n</u>, 478 U.S. at 230 ("The

Judiciary is particularly ill suited to [answer political questions], as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." (quotations omitted)).

To assist lower courts in determining whether a case presents a political question, the Supreme Court has provided six "formulations"[4] that "may describe" a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." Id. (emphasis added). Too, courts should keep in mind that "[t]he doctrine . . . is one of 'political questions,' not one of 'political cases.'" Id. Thus, the "discriminating inquiry" required of courts is not an exercise of "semantic cataloguing,"

---

[4] While each formulation can signify the presence of a political question, a plurality of the Supreme Court has stated that the formulations are listed in decreasing order of importance. See Vieth v. Jubelirer, 541 U.S. 267, 278 (2004).

and courts must consider the "precise facts and posture of a particular case" when analyzing for the presence of a political question. Id.

The military aspect of the case at hand requires an especially intensive evaluation of whether a political question exists, as "military affairs figure prominently among the areas in which the political question doctrine has been implicated." Aktepe, 105 F.3d at 1403; see also Haig v. Agee, 453 U.S. 280, 292 (1981) ("[M]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Generally, "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." Gilligan v. Morgan, 413 U.S. 1, 10 (1973) (emphasis in original); see also Aktepe, 105 F.3d at 1403 ("The Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training." (citations omitted)). Still, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. (citing Baker, 369 U.S. at 211); see also Gilligan, 413 U.S. at 11 ("[W]e neither hold nor imply that the

9

conduct of the National Guard is always beyond judicial review."). Thus, determining whether a military-related case presents a nonjusticiable political question requires the same "discriminating analysis" necessary for any political question doctrine evaluation.

In conducting its discriminating inquiry for the presence of a political question, a court should consider the plaintiff's claims, but it should also evaluate whether the defendant's potential defenses may raise a political question. See Carmichael, 572 F.3d at 1286 ("The court must analyze [a plaintiff's] claim as it would be tried, to determine whether a political question will emerge." (quotations omitted)); Lane v. Halliburton, 529 F.3d 548, 565 (5th Cir. 2008) (The court "must look beyond the complaint, considering how the Plaintiffs might prove their claims and how [the defendant] would defend."). In Carmichael, a service member's guardian brought suit against military contractors alleging that their driver's negligence in losing control of a truck caused injuries to the service member, who was providing military escort for the contractors' convoy in a combat zone.  572 F.3d at 1271. The Eleventh Circuit held that the defendant's likely defenses—which would call military actions and decisions into question—would raise a political question that precluded judicial intervention. 572 F.3d at 1286. Because liability was contested, the defendant "would inevitably . . . try to show that unsound

10

military judgments and policies . . . were either supervening or concurrent causes of the accident." Id. And litigating those issues is "undeniably foreclosed by the political question doctrine." Id. Thus, at every step of the political question analysis, the Court must evaluate the entire case, including GE's potential defenses.

With these principles in mind, the Court now turns to the present case. GE does not argue which specific Baker formulation is applicable, but GE's arguments generally point to application of the first and second formulations. Therefore, the Court discusses, in detail, application of those two formulations. For the reasons stated below, the Court finds the Baker formulations are not applicable to this case[5] and, at present, the political question doctrine does not bar the Court's adjudication of Plaintiffs' claims.

---

[5] For the same reasons explained below, the Court also finds that the third, fourth, fifth, and sixth Baker formulations do not apply to this case. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1365 n.35 (11th Cir. 2007) ("[A]n abbreviated discussion of the last four factors [is] appropriate."). "As the case appears to be an ordinary tort suit, there is no 'impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion.'" Id. at 1365 (quoting Baker, 369 U.S. at 217) (discussing the third formulation). And because GE has not clearly shown that this "suit will implicate a decision made by a coordinate branch of government," "[t]here is also no evident 'impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government.'" Id. (quoting Baker, 369 U.S. at 217) (discussing the fourth formulation). And finally, as to the fifth and sixth formulations, "[GE] simply has not shown that the case implicates any 'political decision' or decision made by any other 'department[]' of government." Id. (quoting Baker, 369 U.S. 217).

c. **At this point in the proceedings, the political question doctrine does not bar Plaintiffs' claims.**

   i. **This case does not present an issue that is demonstrably committed to another branch.**

"The first <u>Baker</u> formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government." <u>Lane</u>, 529 F.3d at 560 (citing <u>McMahon v. Presidential Airways, Inc.</u>, 502 F.3d 1331, 1359 (11th Cir. 2007)). "[W]hen faced with an 'ordinary tort suit,' the textual commitment factor actually weighs in favor of resolution by the judiciary. It is an extraordinary occasion, indeed, when the political branches delve into matters of tort-based compensation." <u>Id.</u> (citations omitted). GE is neither a coordinate branch of the federal government nor, "like the military, part of a coordinate branch." <u>McMahon</u>, 502 F.3d at 1359. GE is a private contractor. Dkt. No. 94 ¶¶ 9, 17, 25. Therefore, "[t]o invoke the first <u>Baker</u> factor, [GE] must [] carry a double burden." <u>Id.</u> "First, it must demonstrate that the claims against it will require reexamination of a decision by the *military*." <u>Id.</u> (emphasis in original) (citations omitted). "Then, it must demonstrate that the military decision at issue is . . . insulated from judicial review." <u>Id.</u> at 1359–60. <u>McMahon</u> is generally instructive in this regard.

In <u>McMahon</u>, the defendant, Presidential Airways, Inc. ("Presidential"), entered into a contract with the Department of Defense ("DOD") "to provide air transportation and other support

services in aid of the military mission in Afghanistan." Id. at
1336. Under the contract, Presidential "was to have general
responsibility for making decisions regarding the flights it
provided to the DOD" and "ultimate responsibility of ensuring the
safety of the flights it was operating." Id. at 1360. The DOD, on
the other hand, had duties that were "relatively discrete,"
including choosing the timing of flights and imposing certain
constraints on Presidential's exercise of its supervisory
responsibilities. Id. at 1361. The plaintiffs, survivors of
soldiers killed in a crash of a plane operated by Presidential in
Afghanistan, sued Presidential for negligence, and Presidential
sought to dismiss the suit based on the political question
doctrine. Id. at 1337. Applying the "double burden" standard for
private contractors invoking the first Baker formulation, the
Eleventh Circuit held that the case did not raise an issue that
was constitutionally committed to another branch. Id. at 1362.
Notably, the court found that Presidential had not satisfied the
initial step in its double burden because the plaintiffs'
allegations did not "relate to any of the[] discrete areas of
military responsibility" for the flights. Id. at 1361. Too, the
case did not represent a challenge, "on any level, [to] the
military's ultimate decision to use private contractors to
transport soldiers." Id. Thus, there was no evidence showing "that
resolution of [the plaintiffs'] negligence claims [would] require

reexamination of any decision made *by* the U.S. military." Id. (emphasis in original).

While Plaintiffs argue that, under McMahon, GE's invocation of the first Baker formulation fails at the initial step of the double burden analysis, GE asks the Court to consider this case under the Eleventh Circuit's later decision of Carmichael. There, the defendant, Kellogg, Brown and Root Services ("KBR"), had contracted with the military to assist in transporting fuel as a part of "highly militarized" convoys throughout Iraq. 572 F.3d at 1276. KBR's responsibility was limited—it provided a driver to operate one of the fuel tankers. Id. at 1281. The military controlled every other aspect of the convoy, including the speed travelled, the number of vehicles in the convoy, and the security measures to be employed. Id. at 1281–82. As a result of a fuel tanker rolling over during a convoy, a service member suffered severe brain injuries and sued KBR and its employee-driver for negligence. Id. at 1278–79. KBR moved to dismiss the case based on the political question doctrine, and the Eleventh Circuit ultimately upheld the district court's dismissal, finding the case "would require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war." Id. at 1281. Importantly, the court noted the military's exclusive control over "virtually every aspect of the convoy." Id. at 1281–82. Further, because the convoy occurred in Iraq during a time of active

conflict, the decisions surrounding the convoy, including the "judgment to organize the convoy in the first place," "required the specific exercise of *military* expertise and judgment." Id. at 1282 (emphasis in original). Even though the plaintiffs contended that KBR *alone*—not the military—was responsible for the fuel tanker's crash, the court found the military's exclusive control over the convoy indicated otherwise. Id. at 1285. Based on the "substantial evidence" before it, the court found that the defendant "would inevitably . . . try to show that unsound military judgments and policies . . . were either supervening or concurrent causes of the accident." Id. And because those defenses would require the court to evaluate military judgments, "[l]itigation involving these issues is undeniably foreclosed by the political question doctrine." Id.

Upon review of both McMahon and Carmichael, it is evident that there is some tension between the two cases. Indeed, in Carmichael, the Eleventh Circuit addressed that tension and highlighted several distinctions that led to the different results. Id. at 1290-91. First, the court noted the different levels of control exercised by the military in each case. Id. at 1290. While the military's authority and responsibility over the McMahon flight was "limited and discrete," its control over the fuel-supply convoy in Carmichael was "plenary." Id. Second, the centrality of military activities differentiated the cases. Id. at

15

1291. The crash in McMahon "took place during a more or less routine airplane flight," the plaintiff there "never claimed that the military activities in Afghanistan were related in any way to the accident," and "the fact that the crash took place over Afghanistan during wartime was incidental." Id. In contrast, "the military dimension of the underlying events" leading to the fuel tanker rollover in Carmichael was "utterly central," as "the convoy's mission was to deliver fuel supplies necessary for military operations." Id. Third and finally, the court noted that its "holding in McMahon was merely provisional, turning in key part on the limited nature of the factual record in the case." Id. "Given the lack of discovery" in McMahon, "it was simply too soon to tell whether the plaintiff's suit would implicate political questions." Id.; see also McMahon, 502 F.3d at 1362 ("*At this early stage of the litigation*, we therefore cannot say it is evident that McMahon's suit will call into question decisions made by the military." (emphasis added)). The record before the court in Carmichael, however, "ha[d] been fully developed," making it "*completely evident* that the suit would require [] review [of] many basic questions traditionally entrusted to the military." Id. (emphasis added).

At this stage of the litigation, the present case more closely mirrors McMahon, as the Court "cannot say it is evident that [Plaintiffs'] suit will call into question decisions made by the

16

military." McMahon, 502 F.3d at 1362. Turning first to Plaintiffs'
claims, the Court finds nothing in the second amended complaint
that would *necessarily* require "reexamination of a decision made
by the military." Id. at 1359. Plaintiffs seek damages from GE for
allegedly failing to properly install the No. 7 B-nut on the
Engine. See Dkt. No. 94 at 29. Plaintiffs' allegations against GE
do not raise any issues as to the military's "discrete
responsibility" with regard to the Engine—the allegations are
limited entirely to GE's responsibility. McMahon, 502 F.3d at 1361.
In fact, the only military decision relevant to Plaintiffs' claims
is the Army's decision to use GE to manufacture the Engine. And
Plaintiffs do not challenge, "on any level, the military's ultimate
decision to use [a] private contractor," GE, to manufacture the
Engine. Id.; see also Dkt. No. 100 at 16 ("Because the Army
selected the GE engine to power its MH-60 helicopters is not the
issue in this case, it is the negligence and manufacturing
defect."). At this point, there is nothing in Plaintiffs'
allegations that would require the Court to reevaluate a decision
that is demonstrably committed to the military.

Where the military's decision may be relevant to adjudication
of this case, however, is through GE's potential defenses. See
Lane, 529 F.3d at 565 (requiring a court to "look beyond the
complaint, considering how the Plaintiffs might prove their claims
and how [the defendant] would defend"). In its reply brief, GE

17

notes several defenses it intends to raise if this case were to proceed. See Dkt. No. 106-2 at 10-12. "GE asserts that the acts and omissions of the Army, among others, are the proximate cause of Plaintiffs' alleged damages." Id. at 10. To make this argument, GE relies on the Investigative Report, which found, *inter alia*, that "[t]he failure of the crew to rapidly recognize and respond to the engine failure is a present and contributing factor to this accident."[6] Dkt. No. 106-4 at 11. GE argues that its potential defenses mirror those asserted in Carmichael, and thus, the Court should find the political question forecloses the case. But GE's reliance on Carmichael is misplaced.

As a result of the parties having completed discovery, the Carmichael court decided the case based on a record that had been "fully developed."[7] 572 F.3d at 1291. In this case, no discovery

---

[6] GE also points out several other potential causes of the accident that may require reevaluation of a military decision. See Dkt. No. 106-2 at 110-11 ("The Army's own investigators criticized, among other things, the failure to report a perceived fuel leak prior to the incident, the environmental conditions and gross weight of the helicopter, Plaintiffs' insufficient training, and non-compliance with numerous military regulations on the day of the incident, demonstrating that these are relevant issues to ascertaining the cause of the accident and the validity of GE's affirmative defenses.").

[7] Earlier in the Carmichael litigation, before any discovery had been completed, the district court denied KBR's motion to dismiss based on the political question for the same reason the Court denies GE's motion on this ground today—there was simply not enough evidence to support finding a political question. See Carmichael v. Kellogg, Brown & Root Servs., 450 F. Supp. 2d 1373, 1376 (N.D. Ga. 2006) ("The discovery period has just begun, and because of the limited facts, it is impossible to say with certainty whether

has been completed, and as such, there is a limited factual record. A well-developed factual record is necessary to determine a question of causation, especially when the political question doctrine is asserted. See, e.g., Nice v. L-3 Communs. Vertex Aero. LLC, 885 F.3d 1308, 1313 (11th Cir. 2018) ("[D]etermining whether the defendants' comparative fault defense would force the jury to evaluate sensitive Navy decisions requires us to answer the disputed question of who caused the crash: the Navy, the defendants, or both. That case-specific inquiry does not present a pure question of law but a mixed one of law and fact."). "Given the lack of discovery in th[is] case . . . it [is] simply too soon to tell whether [Plaintiffs'] suit [] implicate[s] political questions." Carmichael, 572 F.3d at 1291. Too, the military aspect of this case is not "utterly central" like it was in Carmichael. Id. While this was a training mission, it was not a mission to deliver fuel supplies necessary for military operations, and the conditions were not "potentially life-threatening" by nature of taking place in an active warzone. Id. Still, further development of the factual record may prove otherwise, and upon completion of

_____

this case will involve a nonjusticiable political question."). It was only after completion of discovery that the court decided to grant KBR's renewed motion to dismiss based on the political question doctrine. See Carmichael, 572 F.3d at 1279 ("After completion of discovery, KBR again moved to dismiss on political question grounds. The district court carefully examined all of the evidence and, this time, concluded that the suit raised political questions.").

discovery, the Court will again complete a discriminating inquiry into whether a political question exists. But at this point, GE has failed to satisfy its initial burden of the double burden test, as it has not "demonstrate[d] that the claims against it will require reexamination of a decision by the *military*." McMahon, 502 F.3d at 1359. Thus, the first Baker formulation is not applicable to this case in its present state.

### ii. There are judicially manageable standards the Court can use to resolve this case.

Turning now to the second Baker formulation, GE argues that "there simply are no judicially manageable standards to decide what is negligent and what is not in the high-risk, specialized world of military operations." Dkt. No. 95 at 19. Simply put, GE contends that "designing, manufacturing, and maintaining a Blackhawk helicopter that will be flown a few feet off the water in a war zone is [] unlike any stateside, civilian product-manufacturing scenario." Id. Plaintiffs respond that GE did not "design, manufacture, or maintain" the Helicopter, but instead, it only "manufactured and overhauled the [E]ngine." Dkt. No. 100 at 15. Thus, Plaintiffs contend that this case does not involve evaluating the training exercise that resulted in the Crash—it concerns only GE's alleged negligence in manufacturing the Engine. Id. at 15–16. Based on the allegations contained in the second amended complaint, the Court agrees with Plaintiffs.

20

"It is well within the competence of a federal court to apply negligence standards to a plane crash." McMahon, 502 F.3d at 1364. Indeed, "courts have been hesitant to dismiss cases under the political question doctrine when a case arises under tort law, since states generally have well-established tort and negligence frameworks that provide clear standards for resolving cases." Lofgren v. Polaris Indus., 509 F. Supp. 3d 1009, 1028 (M.D. Tenn. 2020); see also Bixby v. KBR, Inc., 748 F. Supp. 2d 1224, 1239 (D. Or. 2010) ("[T]raditional principles of tort law provide . . . standards, and the fact that the torts at issue here were committed in the context of services performed under a contract with the military does nothing to render those standards inapplicable."); Rodriguez v. Gen. Dynamics Armament & Tech. Prods., 696 F. Supp. 2d 1163, 1186 (D. Haw. 2010) ("Plaintiffs' negligence and strict liability claims do not require the court to delve into the reasonableness of military procedures. Plaintiffs' claims seek damages and are therefore easy for the court to resolve based on judicially manageable standards."). In Linder v. Portocarrero, the Eleventh Circuit agreed with this sentiment, finding that the second Baker formulation did not apply where a court was faced with "allegations of tort liability." 963 F.2d 332, 337 (11th Cir. 1992). This logic also applies to the present case.

Relevant to this analysis, Plaintiffs bring claims for negligence and strict liability. See generally Dkt. No. 94. And

21

even though GE posits that the standards for negligence would be markedly different when considering a crash occurring off the coast of Yemen, Plaintiffs' allegations do not challenge anything related to the military training exercise that led to the Crash. Their claims deal only with whether GE incorrectly installed the No. 7 B-nut on the Engine, which took place "at the GE Winfield plant in August 2016," years before the training exercise. Dkt. No. 95 ¶ 25; see also McMahon, 502 F.3d at 1364 ("We readily acknowledge that flying over Afghanistan during wartime is different from flying over Kansas on a sunny day. But this does not render the suit inherently non-justiciable."). Even if the Court would have to consider the Engine's performance in a military training exercise, "[t]he flexible standards of negligence law are well-equipped to handle varying fact situations." Id. Thus, based on Plaintiffs' allegations,[8] "the common law of tort provides clear and well-settled rules on which the [] court can easily rely, [and] this case does not require the court to render a decision in the

---

[8] GE also argues that its defenses will require the Court to evaluate the Army's training of the Flight Crew, which the Court would have no judicially manageable standards to do. But at this time, "[t]here is . . . no evidence in the record to suggest that the [Flight Crew's] actions were the result of inadequate training or a lack of communication." Getz v. Boeing Co., No. CV 07-6396, 2008 WL 2705099, at *28 (N.D. Cal. July 8, 2008). Thus, like the Court's holding with regard to the first Baker formulation, there is nothing in the limited factual record to indicate that anything other than ordinary tort principles will govern this case. If additional discovery substantiates GE's potential defenses, the Court may find otherwise.

absence of 'judicially discoverable and manageable standards.'" Linder, 963 F.2d at 337 (quoting Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2d Cir. 1991)). At this point, GE has not shown that the second Baker formulation is inextricably linked to the present case.

At bottom, this case is at too early a stage for the Court to accurately determine whether its adjudication will require consideration of a political question. "As McMahon held, the *possibility* that military decision-making will be implicated, without evidence to demonstrate its applicability to Plaintiffs' claims or Defendants' defenses, is insufficient to implicate a political question." Getz, 2008 WL 2705099, at *8 (citing McMahon, 502 F.3d at 1361). At this point, there is only a possibility that the Army's decision-making will be implicated. Therefore, GE's motion to dismiss Plaintiffs' second amended complaint based on a political question is **DENIED without prejudice.** Upon completion of discovery, the Court is prepared to reexamine the applicability of the political question doctrine. See McMahon, 502 F.3d at 1365 ("The existence of a political question deprives a court of jurisdiction . . . [GE] remains free to assert the argument at any time, and the district court has an independent obligation to make sure that the disposition of the case will not require it to decide a political question."). The Court now turns to GE's alternative arguments in support of dismissal.

23

## II.  GE's Other Arguments for Dismissal

GE argues certain claims should be dismissed because (1) the second amended complaint is a shotgun pleading, (2) Plaintiffs did not plead their claims with specificity, and (3) Plaintiffs' allegations fail to meet the plausibility standard. Dkt. No. 95. GE also argues Plaintiff Rivera-Lopez's prayer for nonpecuniary damages related to her husband's death is foreclosed by the Death on the High Seas Act. Id.

### a. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

24

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79. A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. For Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (emphasis added) (quoting Fed. R. Civ. P. 8(a)(2)).

Though the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Iqbal, 556 U.S. at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

**b. The second amended complaint is not a shotgun pleading.**

GE's first alternative argument is that the wrongful death and survival claim (Count II)[9] should be dismissed because the second amended complaint is a shotgun pleading and "GE is unable to ascertain the grounds upon which Count II rests." Dkt. No. 95 at 2. Specifically, GE contends that the second amended complaint "incorporates by reference the Count I allegations and all prior factual allegations[] but not the allegations in the remaining tort counts." Id. And because of that, "it is unclear whether [Plaintiff Rivera-Lopez] seeks wrongful death and survival damages based only on GE's alleged negligence and not based on any other alleged misconduct."[10] Id. at 7. GE also relies on this Court's

---

[9] Only Plaintiff Amanda Rivera-Lopez, as surviving spouse of Emil Rivera-Lopez, brings Count II. Dkt. No. 94 ¶ 41.

[10] GE also argues that the second amended complaint's use of the plural form of decedent, "decedents," in one paragraph of Count II is confusing because the second amended complaint refers only to one decedent, Emil Rivera-Lopez. Dkt. No. 95 at 7 (citing Dkt. No. 94 ¶ 43). Plaintiffs argue that this was a "scrivener's error" and resulted from a misplaced apostrophe. Dkt. No. 100 at 8. More importantly, Plaintiffs maintain that the use of decedents, rather than decedent, is "not so confusing that GE does[ not] know or understand the allegations against them." Id. The Court finds this typographical error does not rise to the level of a shotgun pleading and does not affect GE's ability to understand the claims against it. Put another way, "[b]oth parties are clearly aware

Order dismissing Plaintiffs' first amended complaint on shotgun pleading grounds, arguing that Plaintiffs' second amended complaint suffers from the same deficiencies discussed by the Court previously. Dkt. No. 95 at 6-7 (citing Dkt. No. 93 at 8-9).

Plaintiffs maintain that the second amended complaint "is very precise . . . both factually and legally." Dkt. No. 100 at 5. As to Count II, Plaintiffs argue that, when read "in its entirety," the second amended complaint states that Plaintiff Rivera-Lopez is seeking wrongful death damages under Count I, negligence, and Count III, strict liability, "as the complaint references the damages already alleged in the complaint." Id. at 7-8 (citing Dkt. No. 94 at 50). Moreover, "[i]n Count IV, strict product liability, the [second amended] complaint states the manufacturing defect caused the death of Emil Rivera-Lopez and the damages of his death." Id. at 8. Plaintiffs also argue that the second amended complaint remedied the defects of their first amended complaint, as the second amended complaint's "precise allegations were not present in the original complaint[ because] Plaintiffs had not yet had the advantage of the [Investigative Report]." Id. at 7 (highlighting the factual allegations regarding the cause of the Crash). At bottom, Plaintiffs maintain: "There are no ambiguities in Count II

---

that there was only one crew member who lost his life as a result of the crash: Emil Rivera-Lopez." Id.

of the [second amended complaint]" and "[t]he allegations against GE are not so vague that they cannot respond." Id.

Upon consideration of the Eleventh Circuit's shotgun pleading standard, the Court agrees with Plaintiffs and finds the second amended complaint is not a shotgun pleading and is not so vague that GE cannot understand the allegations against them. "Shotgun pleading" is a term used to refer to a complaint that violates either Rule 8(a)(2) or Rule 10(b) of the Federal Rules of Civil Procedure. Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has endeavored to clarify what constitutes a shotgun pleading by identifying four "rough types or categories" of shotgun pleadings. Id. at 1321. Those include: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint;" (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) a complaint that does not separate "into a different counts each cause of action or claim for relief;" and (4) a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." Id. at 1321–23. Still, "[t]he unifying characteristic of

all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Id. at 1323. The second amended complaint does not fall into any of these categories, nor does it fail to give GE adequate notice of the grounds upon which each claim rests.

While GE does not argue which type the second amended complaint is, its argument seems to point to the first type.[11] See Dkt. No. 95 at 6–7. But the second amended complaint is not the first type of shotgun pleading because each count does not incorporate by reference "the allegations of *all preceding counts*." Weiland, 792 F.3d at 1321 (emphasis added). Notably, each count in the second amended complaint adopts only the factual allegations and the allegations specifically associated with Count I, negligence. See, e.g., Dkt. No. 94 ¶ 66 (With regard to Count V for Breach of Warranty, "[t]he Plaintiffs re-allege and

---

[11] In the event GE is arguing the second amended complaint is one of the other three types, the Court rejects GE's argument. The second type of shotgun pleading is not at issue because there are no unnecessary factual allegations present in the second amended complaint. See Dkt. No. 94 ¶¶ 1-30. Indeed, the Court finds the factual allegations are precise and related only to the Crash or the specific defect that allegedly caused the Engine's failure. See, e.g., Dkt. No. 100 at 7 ("The complaint succinctly points out the actual part, the [E]ngine's fuel manifold No. 7 B-nut and injector were incorrectly installed by GE." (citing Dkt. No. 94 ¶ 29)). The second amended complaint is not the third type of shotgun pleading because it separates each cause of action into different counts. See, e.g., Dkt. No. 94 at 6, 8, 10, 11, 14. And it is not the fourth type because there is only one defendant, GE.

incorporate by reference paragraphs 1-40 as though fully set forth [in] all other paragraphs of this Complaint."). While this may "look[], at first glance, like the most common type of shotgun pleading . . . it is not." <u>Weiland</u>, 792 F.3d at 1324. Instead, the Eleventh Circuit "has condemned the incorporation of preceding paragraphs where a complaint 'contains several counts, predecessors [i.e., predecessor counts], leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions.'" <u>Id.</u> (quoting <u>Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.</u>, 305 F.3d 1293, 1295 (11th Cir. 2002)); <u>see also</u> <u>Magluta v. Samples</u>, 256 F.3d 1282, 1284 (11th Cir. 2001) (identifying a complaint as a shotgun pleading where each count incorporated by reference the general factual allegations "while also incorporating the *allegations of any count or counts that precede[d] it*" (emphasis added)). Plaintiffs' second amended complaint does not suffer from this defect and is not the first type of shotgun pleading.

In addition to not having the unique characteristics of the four types of shotgun pleadings outlined by the Eleventh Circuit, the second amended complaint also does not suffer from the unifying defect of all shotgun pleadings: "fail[ure] . . . to give the defendant[] adequate notice of the claims against [it] and the grounds upon which each claim rests." <u>Weiland</u>, 792 F.3d at 1323. Even if the second amended complaint suffers from some minor

defects (i.e., a misplaced apostrophe), those defects do not make it so confusing that GE cannot understand Plaintiffs claims against it.[12] See <u>Hagan v. Comm'r, Ga. Dep't of Corr.</u>, No. 22-12180, 2023 WL 5621895, at *6 (11th Cir. Aug. 31, 2023) ("[D]espite Plaintiff's complaint exhibiting some characteristics of a shotgun pleading, the complaint provided sufficient notice to Defendants of the claims asserted against them and the grounds upon which the claims rested."). GE's motion to dismiss Count II on shotgun pleading grounds is therefore **DENIED.**

**c. The second amended complaint's allegations are sufficient to state a claim for strict liability.**

Next, GE argues that Counts III and IV[13] should be dismissed because Plaintiffs' allegations fail to state a claim for strict liability under Georgia law and fail to meet federal pleading standards. Dkt. No. 95 at 8. Essentially, this argument boils down to GE's contention that Plaintiffs' allegations are not sufficient to show two necessary elements of a strict liability claim: (1) what specific defect Plaintiffs' claims rest upon and (2) how that defect was the proximate cause of Plaintiffs' injuries. The Court finds GE's argument unavailing for the following reasons.

---

[12] Indeed, at the hearing on this matter, GE's counsel effectively accepted that GE could understand the claims against it.
[13] In Count III, all Plaintiffs claim GE is strictly liable for its negligence in manufacturing the Engine. Dkt. No. 94 at 10. In Count IV, all Plaintiffs bring a claim for strict products liability against GE under O.C.G.A. § 51-1-11. <u>Id.</u> at 11.

To establish a strict liability claim under Georgia law, Plaintiffs' allegations must be sufficient to show that: (1) the Engine was defective—or put another way, was "not merchantable and reasonably suited for the use intended;" and (2) the Engine's "condition when sold [was] the proximate cause of the injury sustained." O.C.G.A. § 51-1-11. In Georgia, strict liability claims can be based on three types of product defects: manufacturing defects, design defects, and marketing/packaging defects. See Banks v. ICI Ams., Inc., 450 S.E.2d 671, 672 (Ga. 1994) ("O.C.G.A. § 51-1-11 imposes strict liability for defective products[,] and . . . a product that is 'properly prepared, manufactured, packaged and accompanied with adequate warning and instructions . . . cannot be said to be defective.'" (quoting Center Chemical Co. v. Parzini, 218 S.E.2d 580, 582 (Ga. 1975))). GE asks the Court to find that Plaintiffs have not sufficiently alleged any of those three defects. Dkt. No. 95 at 10–12. Plaintiffs concede that "they are not alleging a design defect cause of action." Dkt. No. 100 at 9 n.1. Instead, they argue that the second amended complaint "properly describes a manufacturing defect." Id. at 8. Thus, the Court considers GE's arguments regarding Plaintiffs' strict liability claim in the context of a manufacturing defect. To that end, GE contends that Plaintiffs' allegations are insufficient as to both the defect and causation

requirements.[14] See Dkt. No. 95 at 11 ("Plaintiffs fail to plead facts showing a specific manufacturing defect or how it caused their injury.").

Regarding the defect requirement, "[a] manufacturing defect is 'measurable against a built-in objective standard or norm of proper manufacture.'" Morgan v. Dick's Sporting Goods, Inc., 359 F. Supp. 3d 1283, 1292 (N.D. Ga. 2019) (quoting Banks, 450 S.E.2d at 673 n.2). Further, "a manufacturing defect will always be identifiable as a deviation from some objective standard or a departure from the manufacturer's specifications established for the creation of the product." Jones v. Amazing Products, Inc., 231 F. Supp. 2d 1228, 1236 (N.D. Ga. 2002). While the general standard for strict liability claims is clear, courts differ on whether a plaintiff must allege a *specific* manufacturing defect to state a claim for strict liability. Compare Moore v. Mylan Inc., 840 F. Supp. 2d 1337, 1344 (N.D. Ga. 2012) (finding that a plaintiff failed to state a claim for strict liability based on a manufacturing defect where "plaintiff ha[d] not alleged any specific design or manufacturing defect"), with Williams v. Am.

---

[14] At the motion to dismiss stage, Plaintiffs must also allege that GE "manufactured the allegedly defective product." Edwards v. Wis. Pharmacal Co., LLC, 987 F. Supp. 2d 1340, 1345 (N.D. Ga. 2013). Plaintiffs satisfied this requirement by alleging that "[t]he engine that failed during the accident . . . was overhauled at the GE Winfield plant in August 2016." Dkt. No. 94 ¶ 25. And GE does not argue otherwise.

Med. Sys., 548 S.E.2d 371, 372 (Ga. 2001) ("It is not necessary for the plaintiff to specify precisely the nature of the defect." (citations omitted)). But regardless of the correct standard, Plaintiffs have satisfied their burden because they have alleged a specific manufacturing defect. Plaintiffs allege that "the [E]ngine's fuel manifold No. 7 B nut and injector were incorrectly installed by [GE]." Dkt. No. 94 ¶ 29. This allegation represents a specific manufacturing defect: the incorrect installation of the No. 7 B-nut and injector.

As to the proximate cause requirement, Plaintiffs argue the second amended complaint "is replete with allegations that the improperly installed fuel manifold No. 7 B-nut and injector resulted in [a] fuel leak and subsequent engine shutdown and crash which are the proximate cause of the Plaintiffs' injuries." Dkt. No. 100 at 10. The Court agrees. As an example, Plaintiffs allege that GE's improper installation of the No. 7 B-nut "allowed the O-ring to become displaced or lacerated by the present fuel pressure," "result[ing] in a fuel leak during engine operation," and "[t]he fuel leak resulted in the engine quitting which caused the [H]elicopter to lose lift and crash." Dkt. No. 94 ¶¶ 29, 30. Plaintiffs also allege that, as a result of the Crash, "all crew members were injured," and Decedent Rivera-Lopez was declared dead. Id. ¶ 24. The federal pleading standards "simply call[] for enough facts to raise a reasonable expectation that discovery will

reveal evidence of the necessary element." <u>Watts v. Fla. Int'l</u> <u>Univ.</u>, 495 F.3d 1289, 1295–96 (11th Cir. 2007). Plaintiffs' allegations meet this standard, as it pertains to the proximate cause element of a strict liability claim, because their factual allegations are sufficient to "permit the [C]ourt to infer more than the mere possibility of misconduct." <u>Iqbal</u>, 556 U.S. at 679. Thus, the Court finds that Plaintiffs' factual allegations are sufficient to state a claim for strict liability based on a manufacturing defect, and GE's motion to dismiss Counts III and IV for failure to state a claim is **DENIED.**

**d. Plaintiffs fail to state a claim for breach of warranty.**

Next, GE asks the Court to dismiss Count V because Plaintiffs failed to state a claim for breach of warranty under Georgia law. GE argues that Plaintiffs cannot bring a breach of warranty claim against GE because Georgia law requires Plaintiffs to show that they were in privity with GE. <u>See, e.g.</u>, <u>Edwards</u>, 987 F. Supp. 2d at 1346 ("[A] plaintiff who does not plead facts that allow the court to infer that he is in privity with the defendant or part of the statutory class of protected persons fails to state a claim for breach of an express or implied warranty."). Plaintiffs concede that they have failed to state a claim for breach of warranty under Georgia law. <u>See</u> Dkt. No. 100 at 11 ("Plaintiffs agree that Georgia law does require privity in warranty claims and that there is no privity between GE and the Plaintiffs in the purview of breach of

35

warranty claims."). Thus, GE's motion to dismiss Count V is **GRANTED**.

### e. Plaintiffs' request for punitive damages is a prayer for relief not subject to dismissal.

GE also asks the Court to dismiss Plaintiffs' claim for punitive damages because they "failed to allege sufficient facts that would entitle them to punitive damages." Dkt. No. 95 at 14. But Plaintiffs' request for punitive damages is not a claim that is subject to dismissal. See City of Los Angeles v. Lyons, 461 U.S. 95, 130 (1983) ("The prayer for relief is no part of the plaintiff's cause of action." (citations omitted)); Cohen v. Office Depot, Inc., 184 F.3d 1292 (11th Cir. 1999) ("[A] request for punitive damages is not a 'claim' within the meaning of [Rule] 8(a)(2); it is only part of the relief prayed for in a claim."), vacated in part on other grounds, 204 F.3d 1069 (11th Cir. 2000). Here, Plaintiffs correctly note that "[p]unitive damages are referenced in the complaint at the end along with other prayers for relief." Dkt. No. 100 at 11–12. And because Plaintiffs still have viable claims for negligence and strict liability, their prayer for punitive damages should not be dismissed. See Branch v. O'Brien, No. 4:14-cv-147, 2014 WL 7405780, at *2 (S.D. Ga. Dec. 29, 2014) ("Whether a claim for relief should be dismissed under Rule 12(b)(6) 'turns not on whether [a plaintiff] has asked for the proper remedy but whether he is entitled to *any* remedy.'"

(quoting <u>Lyons</u>, 461 U.S. at 130)); <u>cf.</u> <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1304 (11th Cir. 2009) ("A punitive damages claim is derivative of a plaintiff's tort claim and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."). Accordingly, GE's motion to dismiss Plaintiffs' request for punitive damages is **DENIED**.

### f. Plaintiff Rivera-Lopez's wrongful death claim is governed by the Death on the High Seas Act.

Finally, GE argues that any of Plaintiff Rivera-Lopez's claims for non-pecuniary loss, including her request for punitive damages, should be dismissed because the Death on the High Seas Act (DOHSA) applies. DOHSA provides: "When the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. Even though GE's alleged negligence occurred on land, the Crash and Decedent Rivera-Lopez's death occurred in the Gulf of Aden, so DOHSA governs the action. See <u>LaCourse v. PAE Worldwide Inc.</u>, 980 F.3d 1350, 1357 (11th Cir. 2020) ("Where a death occurs on the high seas, DOHSA applies, full stop."); <u>In re Dearborn Marine Serv., Inc.</u>, 499 F.2d 263, 272 n.17 (5th Cir. 1974) ("DOHSA has been construed to confer admiralty jurisdiction over claims arising out of airplane crashes on the

high seas though the negligence alleged to have caused the crash occurred on land."). Indeed, Plaintiffs concede that DOHSA governs Plaintiff Rivera-Lopez's claims. See Dkt. No. 100 at 12 (DOHSA "is the proper avenue of recovery for Amanda Beth Rivera-Lopez's claims."). Accordingly, Plaintiff Rivera-Lopez may not seek any non-pecuniary damages relating to her husband's death. See LaCourse, 980 F.3d at 1355 (DOHSA "limits a plaintiff's recovery to 'compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought' and thereby forecloses recovery for emotional injury and punitive damages." (quoting 46 U.S.C. § 30303)). Therefore, to the extent GE moves to dismiss Plaintiff Rivera-Lopez's prayer for non-pecuniary damages, including emotional distress damages and punitive damages, the motion is **GRANTED**.

## CONCLUSION

GE's motion to dismiss, dkt. no. 95, is **DENIED in part** and **GRANTED in part**. First, because this case is at such an early stage of litigation, there is not enough record evidence for the Court to accurately determine whether a political question is raised. Thus, GE's motion to dismiss Plaintiffs' second amended complaint based on the political question doctrine is **DENIED without prejudice**, and GE is free to re-file its motion upon completion of discovery.

Second, the second amended complaint is not a shotgun pleading, so GE's motion to dismiss Plaintiff Rivera Lopez's wrongful death and survival claim (Count II) is **DENIED**. Third, under Georgia law, Plaintiffs' allegations are sufficient to state a claim for strict liability and strict products liability. Therefore, GE's motion to dismiss Counts III and IV for failure to state a claim is **DENIED**. Next, Georgia law requires an allegation of privity to state a claim for breach of warranty, and Plaintiffs have not alleged privity with GE. Therefore, GE's motion to dismiss Count V for failure to state a claim is **GRANTED**. Finally, as to damages, GE's motion to dismiss Plaintiffs' claims for punitive damages is **DENIED** because punitive damages is merely a prayer for relief not subject to dismissal. However, GE's motion to dismiss Plaintiff Rivera-Lopez's prayer for non-pecuniary damages, including emotional distress and punitive damages, is **GRANTED** because DOHSA governs her wrongful death claim.

**SO ORDERED** this 28th day of December, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA